McKinney, J.
delivered the opinion of the court.
The plaintiffs in error were indicted and convicted, jointly, of the crime of stealing a negro slave named Albert, the property of John P. Tagart, the prosecutor.
■ It appears that in the month of June, 1847, said slave absented himself from the service and premises of his master, without the knowledge of the latter, and was advertised as a runaway. In the month of August ensuing, the prisoners were arrested upon the charge of having stolen said slave. Morehead was arrested in Fayette county, and Bryant in the county of Hardeman; in which latter county was the residence of the prosecutor. From the proof in the record, which consists in part of the confessions of the prisoners, it appears, that in the interval between the time the slave left his master’s service and the time of the arrest, -the prisoners had said slave concealed for some two or three weeks near LaGrange in said county of Fayette; and that afterwards and before their arrest, by agreement between them, Bryant run said *636 slave to Mississippi and sold him to one Norwell, in Pontotoc county; but the latter failing to make payment, Bryant took the slave back, and placed him in the hands of one Williams, a confederate of the prisoners, to be run elsewhere and sold; and the prisoners were to share equally the proceeds of the sale. On the trial in the court below, the Circuit Judge instructed the jury, that a runaway slave was presumed to be in the possession of his master, and was the subject of larceny. The first question for our consideration is, was this instruction, in point of Jaw, correct? We think it was. fit is admitted to be the settled law, and has been so declared by this court, repeatedly, that to constitute the crime of larceny there must have been a trespass in the original taking of the property charged to have been stolen. It is also admitted, and is equally well settled, that to constitute a trespass, the subject matter of the alleged trespass must, at the time of the tortious taking, have been in the possession of the persons rightfully entitled thereto. It is equally clear that such possession as would be sufficient to maintain an action of trespass for the wrongful taking, will also be sufficient so far as this ingredient of the crime is concerned, to support an indictment for larceny. Possession is either actual or constructive. The right of property, in things personal, draws to it the possession, which in judgment of law continues until actual adverse possession is taken by another. The rightful owner is, therefore deemed to have the constructive possession, when the property is in the actual custody and occupation of no one. 2 Greenl. on Ev., sec. 614; and although he may never have had the actual possession; 2. Saund. 47, a.* 1 Chit. PI. 169. And upon such constructive possession as against a wrong-doer, the owner may maintain an *637 action of trespass equally as upon an actual possession. So it is alike sufficient to support an indictment for larceny, Hite vs. The State, 9 Yer. 198, 205.
Has the owner of a runaway slave such constructive possession, in the absence of actual intervening adverse possession ? The negative of this proposition is attempted to be maintained by the counsel for the prisoners, for the reason that such slave, while absent or runaway from his owner, is to be regarded as lost property; and that the person taking him,though with a felonious intent, is to be placed in the predicament of a person who takes a lost chattle, as a jewel, watch, pocket-book, or the like; or a horse or cow that has strayed from the owner’s premises, or accustomed range, and is lost to the owner. This reasoning is fallacious, and proceeds upon a false analogy. Lost property is looked upon, for some purposes, as abandoned by the former proprietor; and as such, is returned into the common stock, or mass of things; and therefore as belonging to the first occupant or finder. And though the former proprietor is entitled to maintain an action for the recovery, yet, as against all other persons the title vests in the finder, £ Therefore, though it may have been converted animo furandi, by the person finding it, it is no larceny, because the first taking was lawful. ^ But this principle properly applies, perhaps, only to inanimate things, which cannot be transferred from or cease to be in the possession of the owner, without his own or another’s act or default. It cannot certainly, to the same extent, be applied even to animals, which possess the instinct and power of motion, and can remove themselves from place to place; though these may be lost in some instances, in the proper sense of the term. But it would be most absurd to predicate this of a rational, intelligent being, *638 possessed of reason, of will, memory and all tbe other faculties and attributes of mind; capable of forming and maturing his purposes, and of- electing and applying appropriate means to the attainment of his ends. A slave may voluntarily form and carry into effect, the purpose of throwing off his allegiance to his master, and may transport himself beyond his reach. Still, however, he is not, and cannot be, lost in the sense in which a watch or jewel, or even a horse, may be lost. He has always the capacity, mental and physical, to return at' pleasure, dependent solely upon his own volition; such is not the case in respect either to inanimate objects or animals. And not being lost, or rather being incapable of loss, in the legal sense of the term, he is to be regarded, so long as there is no actual adverse enjoyment, as in the constructive . possession of his master.
To test this principle, let it be supposed that the slave while temporarily absent or runaway from his master’s service, is wantonly beaten or injured by a third person, can there be a doubt that the master, upon his mere constructive possession, might maintain an action of trespass against the wrongdoer? Certainly not. Or suppose personal goods of the master are found in the possession of his runaway slave and are taken from him by a wrongdoer; may not the master, upon his constructive possession maintain trespass to recover the value thereof? and this, although the slave may never be reclaimed. Most clearly he may. And it is equally clear in the latter case, that if the goods were taken and converted with a felonious intent, the crime of larceny would be complete. It is no defence in such case, either upon a charge of stealing the slave or the property of the master found upon him, that, at the time of the taking, he was absent *639 from the visible actual possession of the master; because the latter still retained the constructive possession of both. It is laid down by high authority, that the doctrine of a taking by finding, even in cases to which it properly applies, must be admitted with great limitation and' must be understood to apply where the finder really believes the goods to have been lost by the owner, and does not cover a felonous taking under such a pretence. 1 Hale 506,2 Russ, on Cr. 11, 12, (Ed. of 1845.) Hence, if ahorse be found straying in a common, or on a public highway, and is taken animo f urandi, it is no finding, but felony in him that so takes him, lb. and 2 East. P. C. 664. With much greater reason does this principle apply to slave property. The proposition that a slave, if out of the visible possession and actual control of the master, whether distant from the master’s domicil one mile or one hundred, and whether so absent of his own free will or by the enticement of a wrong-doer, may be feloniously taken and converted with impunity upon the mere pretext of the supposed want of possession by the master, at the time, of taking, would be as startling, as it would be violative of sound principle, and destructive of the security of this species of property. Upon this point, therefore, there was no error in the charge of the court. But in refusing to exclude from the jury the confession of Morehead, we think the court did err. Benjamin Homer, a witness for the prisoners, stated “that he was in the company that went out from LaGrange to arrest Morehead. After he was arrested, some of the company suggested that he should be lynched and made to tell where Bryant was; that one or more of the company said to Morehead it would be better for him to confess, that it was Bryant they were after mainly; that he would probably be made *640 State’s evidence, and that if he would tell all he knew, they would make it go as lightly with him as possible.” Witness thought the prosecutor and officer were near by and in hearing when these remarks were made. The confessions of Morehead, under these circumstances, does not fall within the principle insisted upon by the Attorney General, namely, “that a confession is not inadmissible, although made after an exhortation, or admonition, or other similar influence, proceeding at a prior time from some one who has nothing to do with the apprehension, prosecution, or examination of the prisoner,” 2 Russ, on Crimes 844. Here the inducements to the confession proceeded from some of the company assembled to apprehend the prisoner, and were made, if the witness is to be credited, in the hearing of the prosecutor and officer. Upon well settled principles, therefore, the confession thus obtained was inadmissible. We are, for this reason, constrained to reverse the judgment as to the plaintiff in error, Morehead, although aside from his confession, there is sufficient evidence to support the conviction in our opinion, but it is not our province to estimate what influence the illegal testimony of the prisoner’s confession may have had upon the minds of the jury.
The judgment as to Bryant, will be affirmed, as we think his confession was free from exception.